# IN THE UNITED STATES DISTRICT COURT FOR THE
# NORTHERN DISTRICT OF ILLINOIS, EASTERN DIVISION

| | |
|---|---|
| RAUL FOJAS, Derivatively On Behalf of ALLSTATE CORP., <br>                    Plaintiff, <br> vs. <br><br> F. DUANE ACKERMAN, JAMES G. ANDRESS, ROBERT D. BEYER, W. JAMES FARRELL, JACK M. GREENBERG, RONALD T. LEMAY, EDWARD M. LIDDY, J. CHRISTOPHER REYES, H. JOHN RILEY, JR., JOSHUA I. SMITH, JUDITH A. SPRIESER, MARY ALICE TAYLOR, THOMAS J. WILSON, <br><br>                    Defendants, <br>      -and- <br><br> ALLSTATE CORP., a Delaware corporation, <br><br>                    Nominal Defendant. | Civil Action No. 08-cv-00423 <br> Judge William T. Hart |

**PLAINTIFF'S MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS'
MOTION TO DISMISS FOR FAILURE TO ADEQUATELY
<u>PLEAD DEMAND FUTILITY</u>**

# **TABLE OF CONTENTS**

Page

TABLE OF AUTHORITIES ................................................................................................... ii

I.   INTRODUCTION ........................................................................................................ 1

II.  STATEMENT OF FACTS ........................................................................................... 2

    A.   Background ....................................................................................................... 2

III. LEGAL STANDARDS GOVERNING THIS MOTION .......................................... 4

    A.   Applicable Legal Standards For Evaluating Demand Futility ..................... 4

        1.   Demand is Futile Under the *Aronson* Test ......................................... 4

            (a)   Interest ......................................................................................... 4

            (b)   Independence .............................................................................. 5

            (c)   Business Judgment Rule ............................................................ 5

        2.   In The Alternative, Demand is also Futile Under The *Rales* Test ....... 6

    B.   The Court Must Apply Delaware's "Reasonable Doubt" Standard ............ 7

IV.  THE COMPLAINT ADEQUATELY PLEADS THE FUTILITY OF DEMAND ............... 8

    A.   The Board's Actions are Not Shielded by the Business Judgment Rule ..... 8

        1.   Demand is Futile under the Theory Articulated by the Seventh
            Circuit in *Abbott Labs* ............................................................................ 10

    B.   Plaintiff has Created a Reason to Doubt the Disinterest and Independence of
        A Majority of the Board Under Either the *Aronson* or the *Rales* Test ....... 12

        1.   A Majority of the Directors are Interested Because they Face a Substantial
            Likelihood of Liability ........................................................................... 12

        2.   Plaintiffs' Remaining Allegations Also Demonstrate Demand Futility ....... 15

V.   CONCLUSION ............................................................................................................ 15

## **TABLE OF AUTHORITIES**

**Cases** Page(s)

*Aronson v. Lewis*,
  473 A.2d 805 (Del. 1984) ................................................................................................ *passim*

*Ash v. McCall*,
  2000 Del. Ch. LEXIS 144 (Del. Ch. Mar. 15, 2000) ............................................................... 12

*In re Baxter Int'l, Inc. S'holders Litig.*,
  654 A.2d 1268 (Del. Ch. 1995) ............................................................................................... 12

*Brehm v. Eisner*,
  746 A.2d 244 (Del. 2000) ......................................................................................................... 4

*In re Caremark Int'l Inc. Derivative Litig.*,
  698 A.2d 959 (Del. Ch. 1996) ......................................................................................... *passim*

*In re Cendant Corp. Derivative Litig.*,
  189 F.R.D. 117 (D.N.J. 1999) ............................................................................................ 7, 12

*Desimone v. Barrows*,
  924 A.2d 908 (Del. Ch. 2007) ............................................................................................. 6, 8

*Grimes v. Donald*,
  673 A.2d 1207 (Del. 1996) ....................................................................................................... 7

*Grobow v. Perot*,
  539 A.2d 180 (Del. 1988) ............................................................................................... 4, 7, 8

*Harris v. Carter*,
  582 A.2d 222 (Del. Ch. 1990) ............................................................................................ 7, 15

*In re IAC/InterActive Corp. Secs. Litig.*,
  478 F. Supp. 2d 574 (S.D.N.Y. 2007) .................................................................................... 11

*Jones v. Gen. Elec. Co.*,
  87 F.3d 209 (7th Cir.1996) ....................................................................................................... 4

*Kamen v. Kemper*,
  500 U.S. 90 (1991) ................................................................................................................... 4

*McCall v. Scott*,
  239 F.3d 808 (6th Cir. 2001) ............................................................................................. 4, 14

*McSparron v. Larson*,
  2006 U.S. Dist. LEXIS 53773 (N.D. Ill. May 3, 2006) ......................................................... 11

*In re Oxford Health Plans, Inc.*,
  192 F.R.D. 111 (S.D.N.Y. 2000) ............................................................................................ 12

*Parnes v. Bally Entm't Corp.*,
  722 A.2d 1243 (Del. 1999) ..................................................................................................... 10

*Table of Authorities - Continued*

Page(s)

*Ryan v. Giffford*,
   918 A.2d 341 (Del. Ch. 2007) .................................................................................... 5, 6

*Seminaris v. Landa*,
   662 A.2d 1350 (Del. Ch. 1995) ..................................................................................... 4

*Stone v. Ritter*,
   911 A.2d 362 (Del. 2006) .............................................................................................. 5

*In re The Student Loan Corp. Derivative Litig.*,
   No. 17799, 202 WL 75479 (Del. Ch. Jan. 8, 2002) ................................................... 15

*In re Tower Air, Inc.*,
   416 F.3d 229 (3d Cir. 2005) .......................................................................................... 9

*Vance v. Gallagher*,
   No. 02 C 8249, 2004 WL 1510016 (N. D. Ill. Jul. 7, 2004) ..................................... 15

*In re Walt Disney Co. Derivative Litig.*,
   906 A.2d 27 (Del. 2006) ............................................................................................ 8, 9

*Wilson v. Formigoni*,
   42 F.3d 1060 (7th Cir. 1994) ......................................................................................... 4

**Statutes, Rules & Regulations**

Fed. R. Civ. P.,
   Rule 23.1 ........................................................................................................................ 4

**Secondary Authorities**

*New York Times* ................................................................................................................ 14

*tampabay.com* .................................................................................................................... 15

Plaintiff Raul Fojas ("Plaintiff") respectfully submits this Memorandum of Law in opposition to the Director Defendants'[1] and Nominal Defendant Allstate Corp.'s ("Allstate" or the "Company") Motion to Dismiss.

## I. INTRODUCTION

The Complaint[2] details the defendants' systemic bad faith litigation strategy, which resulted in the Company expending considerable sums to defend this strategy and the loss of billions of dollars in business. In 1992, Allstate hired McKinsey & Co. ("McKinsey") to redesign the Company's claim handling process. ¶35. By 1995, Allstate adopted McKinsey's Claims Core Process Redesign plan and began a three pronged assault on its policy holders: arbitrary denial of claims; random delay in processing and litigating claims; and unfounded reduction of payments to injured policy holders. ¶¶25, 35-36, 45.

Not surprisingly, by 2001, well after nine of the thirteen individual defendants were elected as active members of the Board,[3] these systemic and arbitrary bad faith practices were being regularly attacked in both judicial and regulatory proceedings across the country. ¶¶36-40, 42-43. In the actions against, and investigations of, the Company, the Board approved or acquiesced to the strategy to conceal certain documents, including the McKinsey reports that outlined the claims processing procedures. This decision has had dire effects on the Company.

Notably, the strategy of noncompliance with subpoenas from the Florida Office of Insurance Regulation ("FOIR") has cost the Company millions, if not billions, of business in the State of Florida. In fact, because the Director Defendants caused or allowed Allstate to stonewall its discovery obligations in a regulatory proceeding in Florida the Company is banned from writing new policies in Florida. Yesterday, on May 14, 2008, the First District Court of Appeals in Florida upheld the FOIR's suspension of Allstate from writing new policies in the

---

[1] The "Director Defendants" consist of the thirteen members of Allstate's board of directors ("Board"), namely, F. Duane Ackerman ("Ackerman"), James G. Andress ("Andress"), Robert D. Beyer ("Beyer"), W. James Farrell ("Farrell"), Jack M. Greenberg ("Greenberg"), Ronald T. LeMay ("LeMay"), Edward M. Liddy ("Liddy"), J. Christopher Reyes ("Reyes"), H. John Riley, Jr. ("Riley"), Joshua I. Smith ("Smith"), Judith A. Spreiser ("Spreiser"), Mary Alice Taylor ("Taylor"), and Thomas J. Wilson ("Wilson"). Together, the Director Defendants and Allstate are referred to herein as "Defendants."

[2] All references herein to the "Complaint" are to Plaintiff's Verified Shareholder Derivative Complaint for Breach of Fiduciary Duty, Abuse of Control, Gross Mismanagement, Waste of Corporate Assets, and Unjust Enrichment,, and all references to "¶__," are to the corresponding paragraphs thereof.

[3] By 1999, defendants Ackerman, Andress, Farrell, LeMay, Liddy, Riley, Smith and Spreiser were members of the Board. Defendant Taylor joined just one year later. ¶¶7-8, 10, 11-12, 15-18.

State of Florida ("Florida Appeal Order"). The Court of Appeals called the Company's practices "***willful, indeed potentially criminal***" and noted that its failure to comply with its statutory disclosure requirements prevented the FOIR from adequately investigating its belief that Allstate is systematically defrauding its policyholders. *See* Florida Appeal Order at 17 (emphasis added), attached hereto as Exhibit A. To make matters worse, Allstate is also liable for millions of dollars in fines for being held in contempt of court in other judicial proceedings and for untold millions to defend, settle or satisfy judgments in the civil litigation stemming from its failure to produce documents regarding the Company's claims processing practices. ¶¶50, 54.

Contrary to Defendants' mischaracterization of the Complaint, this action is not about Allstate merely adopting a discovery strategy in an isolated lawsuit. Rather, the Complaint alleges that under the Board's active guidance, the Company (i) adopted or ratified a bad faith litigation strategy in multiple judicial and regulatory proceedings across the country (ii) designed to conceal and perpetuate the arbitrary denial, delay and reduction of payments to injured policy holders (iii) which has already subjected the Company to judgments, civil fines for contempt, potential criminal liability and suspension of Allstate's ability to write policies in Florida.

The sole issue before this Court is whether Plaintiff has sufficiently pleaded that pre-suit demand on the Board is excused. Defendants argue that such pre-suit demand was not excused and that Plaintiff should have demanded that the Board – consisting of the very people within Allstate who approved the bad faith litigation strategy – sue themselves. It simply defies common sense to expect the Director Defendants to make independent and disinterested decisions regarding the viability of the claims asserted in the Complaint, given their explicit approval of the strategy which has now injured Allstate and subjected each of them to a substantial likelihood of personal liability. Accordingly, Defendants' Motion to Dismiss should be denied.

## II.  STATEMENT OF FACTS

**A.     Background**

Allstate is a Delaware corporation that, through its subsidiaries, provides property-liability insurance, in addition to other lines of insurance, throughout the nation. ¶6. In 1992, Allstate retained McKinsey to redesign the Company's claim handling process. ¶35. In 1995, McKinsey issued a report which contained its proposed plan to redesign Allstate's claims processing procedures. *Id*.

The Complaint alleges that Allstate's arbitrary claims processing practices came under attack in numerous judicial and regulatory proceedings across the country, including in Kentucky, Missouri, New Mexico and Louisiana. ¶¶36-40, 42-43, 48-54. In each of these proceedings Allstate risked fines for civil contempt and the entry of default judgments for their calculated non-compliance with discovery orders requiring, *inter alia,* the production of the McKinsey reports. ¶¶37-40, 42. In one such proceeding, Allstate was held in contempt and ordered to pay $25,000 per day for each day the Company defies the court's discovery orders. To date, Allstate is still accruing fines in this matter which have amassed to over $3 million. *Id.*

Government agencies have also sought the McKinsey reports pursuant to their investigations of the Company's price-fixing schemes and claims handling process. ¶¶42-54. In 2007, the FOIR subpoenaed the Company for documents and ordered witnesses to appear in January 2008 in hearings before the agency. ¶43. Allstate, with the approval of the Board, refused to fully answer the subpoena, did not produce the McKinsey reports and failed to provide the appropriate witnesses in connection with the investigation. Due to this refusal and uncooperative behavior the FOIR took the unprecedented step of prohibiting Allstate from writing new policies in Florida, a state in which the Company wrote over $1.9 billion in auto policies in 2006 alone. ¶¶50, 54. This suspension was upheld just yesterday by the Florida Court of Appeals. *See* Florida Appeal Order.[4]

In flagrant disregard of orders emanating from numerous judicial and regulatory authorities, including FOIR, the members of the Board adopted or implicitly approved a strategy of concealment no matter the dire consequences to the Company and its shareholders. This harmful "strategy" has subjected Allstate to millions of dollars in fines for contempt of court,

---

[4] In upholding the lower court's decision the Florida Court of Appeals detailed the numerous discovery abuses that led to FOIR's suspension:

> [FOIR] issued subpoenas and subpoenas *duces tecum*, and scheduled a hearing. Allstate never requested an extension of time. The hearing was held. Allstate appeared at the hearing without the requested documents, and without the required witnesses. At the hearing, Allstate frustrated the Commission's efforts to conduct the required investigation….The record supports the [FOIR] allegation that Allstate's conduct is likely to continue, based on its representations at the hearing, and its history of choosing to incur millions of dollars in fines rather than comply with court-ordered production.

Florida Appeal Order at 16.

3

potential criminal liability, and the loss of over $1.9 billion dollars of auto insurance business alone in Florida alone due to the FOIR's suspension. ¶¶50, 54.

### III.  LEGAL STANDARDS GOVERNING THIS MOTION

**A.   Applicable Legal Standards For Evaluating Demand Futility**

The parties agree that both Federal Rule of Civil Procedure 23.1 and Delaware law are applicable to the demand futility analysis. *See Kamen v. Kemper*, 500 U.S. 90, 108-09 (1991). Federal Rule 23.1 and Delaware law require Plaintiff to allege with particularity the reasons demand would be futile, but Plaintiff is ***not*** required to plead facts sufficient to support a judicial finding of demand futility nor a reasonable probability of success on the merits. *See McCall v. Scott,* 239 F.3d 808, 816 (6th Cir. 2001), citing *Grobow v. Perot,* 539 A.2d 180, 186 (Del. 1988). When deciding a motion to dismiss, the court must assume the truth of all facts alleged in the complaint, construing the allegations liberally and viewing them in the light most favorable to the plaintiff. *Jones v. Gen. Elec. Co.*, 87 F.3d 209, 211 (7th Cir.1996); *Wilson v. Formigoni*, 42 F.3d 1060, 1062 (7th Cir. 1994).

**1.   Demand is Futile Under the *Aronson* Test**

Under Delaware law, it is well-settled that a pre-suit demand on a corporate board of directors need not be made if the facts alleged tend to demonstrate such a demand would have been futile. *Aronson v. Lewis*, 473 A.2d 805, 806-07 (Del. 1984), overruled in part on other grounds *sub nom.*, *Brehm v. Eisner*, 746 A.2d 244 (Del. 2000). In the landmark *Aronson* case, the Delaware Supreme Court established a two-pronged test for assessing demand futility in a shareholder derivative action. Under *Aronson*, pre-suit demand is excused where, under the facts alleged, there is either a reasonable doubt: (1) "the directors are disinterested and independent"; or (2) "the challenged transaction was otherwise the product of a valid exercise of business judgment." *Id.* at 814. The demand futility test enunciated in *Aronson* is disjunctive.[5]

**(a)   Interest**

Delaware courts have recognized that directors are sufficiently "interested" to render demand futile where they face a "substantial likelihood" of liability for the wrongful conduct

---

[5] Thus, "[i]f a derivative plaintiff can demonstrate a reasonable doubt as to the first or second prong of the *Aronson* test, then he has demonstrated that demand would have been futile." *Seminaris v. Landa*, 662 A.2d 1350, 1354 (Del. Ch. 1995); *see also Grobow v. Perot*, 539 A.2d 180, 188-89 (Del. 1988), *overruled in part on other grounds sub nom. Brehm*, 746 A.2d 244 (demand excused where allegations raise reasonable doubt as to either *Aronson* prong).

alleged in the complaint. *See Rales v. Blasband*, 634 A.2d 927, 936 (Del. 1993). Such director liability may arise in two distinct situations: (a) from a board decision that results in a loss because the decision was ill advised (*i.e.* malfeasance); or (b) from an unconsidered failure of the board to act in circumstances in which due attention might have prevented the loss (*i.e.* nonfeasance). *In re Caremark Int'l Inc. Derivative Litig.*, 698 A.2d 959, 967 (Del. Ch. 1996).

### (b) Independence

Independence, on the other hand "means that a director's decision is based on the corporate merits of the subject before the board **rather than extraneous considerations or influences**." *Aronson*, 473 A.2d at 816 (emphasis added). A director may lack independence rendering demand futile where he or she is "beholden" to interested directors *or* "so under their influence that [his or her] discretion would be sterilized." *Rales*, 634 A.2d at 935-37 (citations omitted). Among other situations, a lack of independence has been found where a director holds a position as an employee of the corporation. *Id.* at 937 ("there is a reasonable doubt that [an employee-director] can be expected to act independently considering his substantial financial stake in maintaining his current offices.").

### (c) Business Judgment Rule

Under the business judgment rule, directors are presumed to act in the best interests of the company. *Aronson*, 473 A.2d at 812. To invoke the rule's protection, however, directors must act on an informed basis, in good faith, and with the requisite care in the discharge of their duties. *Id.* A reasonable doubt sufficient to rebut the business judgment rule and render demand futile is created where a petition alleges that the board knowingly and intentionally decides to "exceed the shareholders' grant of express (but limited) authority," or where the complaint "alleges bad faith and, therefore a breach of the duty of loyalty." *Ryan v. Giffford*, 918 A.2d 341, 357 (Del. Ch. 2007). Bad faith may be shown where "the fiduciary intentionally acts with a purpose other than that of advancing the best interests of the corporation, where the fiduciary acts with the intent to violate applicable positive law, or where the fiduciary intentionally fails to act in the face of known duty to act, demonstrating a conscious disregard of this duties." *Stone v. Ritter*, 911 A.2d 362, 369 (Del. 2006).

Other examples of bad faith "include any action that demonstrates a faithlessness or lack of true devotion to the interests of the corporation and its shareholders." *Id.* Under these circumstances, the board's conduct is deemed to be so "egregious on its face that board approval

5

cannot meet the test of business judgment, and a substantial likelihood of director liability therefore exits" rendering demand futile. *Ryan*, 918 A.2d at 356. Importantly, however, any such determination "applies only with respect to demand futility" and should "reflect[] no opinion as to the truth of the allegations or the outcome of the claims on the merits." *Abbott Labs.*, 325 F.3d at 809.

In the present case, the second prong of the *Aronson* test is applicable to the demand futility analysis because the Complaint challenges the decision of the Board to authorize litigation practices which have subjected Allstate to considerable damage. More particularly, Plaintiff alleges that a majority of the Board – at least 9 out of 13 directors – affirmatively approved, or made a conscious decision not to act in the face of Allstate's utter and complete disobedience with various judicial and regulatory orders. The Director Defendants' affirmative approval of this indefensible litigation strategy and/or conscious failure to act to correct it, satisfies the second prong of the *Aronson* test and renders the Director Defendants incapable of considering a pre-suit demand. In other words pre-suit demand is excused in this case because: ratification of these practices could never have been the valid exercise of the Director Defendants' business judgment. *See Desimone v. Barrows*, 924 A.2d 908, 934-935 (Del. Ch. 2007).

### 2. In The Alternative, Demand is also Futile Under The *Rales* Test

Where a complaint does not challenge a specific action or decision of the board or where the plaintiff is not challenging a decision of the board in place at the time the complaint is filed, only the first prong of the *Aronson* test is relevant to the demand futility analysis. In such situations, demand is excused if the plaintiff "create[s] reasonable doubt that, as of the time the complaint is filed, the board of directors could have properly exercised its independent and disinterested business judgment in responding to a demand." *Rales*, 634 A.2d at 933.

The *Rales* test is applicable where the directors' liability is "'predicated upon ignorance of liability creating activities'" and the complaint challenges a board's "'unconsidered' failure to act." *In re Abbott Labs. Derivative S'holder Litig.*, 325 F.3d 795, 805 (7th Cir. 2001) *quoting Caremark*, 698 A.2d at 968.

In this action, under either the first prong of the *Aronson* test or the *Rales* test, the Complaint raises a reasonable doubt as to the ability of a majority of the Board to fairly, independently and disinterestedly consider a pre-suit demand.

6

**B.     The Court Must Apply Delaware's "Reasonable Doubt" Standard**

In assessing demand futility this Court must examine each allegation of the Complaint taken as a whole[6] to determine whether Plaintiff has raised a ***reasonable doubt*** as to the Board's disinterestedness, independence, or exercise of business judgment.  The term "reasonable doubt," as applied by the Delaware courts, can be said to mean "reason to doubt" that the board is capable of making an independent or disinterested decision or that the Board's actions are shielded by the business judgment rule.  *Grimes v. Donald*, 673 A.2d 1207, 1217 (Del. 1996) *overruled in part on other grounds sub nom. Brehm*, 746 A.2d 244.  In *Rales*, the Delaware Supreme Court expressly rejected a request for a more stringent standard much like that requested by Defendants in this action, holding:

> [W]e *reject* the defendants' proposal that, for purposes of this derivative suit and future similar suits, we adopt either a universal demand requirement or a requirement ***that a plaintiff must demonstrate a reasonable probability of success on the merits***.

634 A.2d at 934 (emphasis added).  *See also Grobow*, 539 A.2d at 186-87 (rejecting the more stringent "judicial finding" standard for pleading director interest).

This reasonable doubt standard promotes a strong public policy, since "the derivative suit ... [is a] potent tool [] to redress the conduct of a torpid and unfaithful management." *Rales*, 634 A.2d at 933.  It is further particularly appropriate in derivative suits, because plaintiffs typically have not had the benefit of discovery.  *Id*. at 934 (requiring a reasonable probability of success on the merits would be "an extremely onerous burden to meet at the pleading stage without the benefit of discovery").

Under this "reasonable doubt" standard, Plaintiff is not obliged to prove at the pleading stage that the Director Defendants were interested or that the transaction was not shielded by the business judgment rule.  Instead, Plaintiffs must allege, with particularity, facts that would give a reasonable shareholder reason to doubt the ability of the Board to consider a demand.  *Rales*, 634 A.2d at 933 (endorsing reasonable doubt standard); *Grimes*, 673 A.2d at 1217 n.17 ("the concept

---

[6] The allegations of the Complaint may not be parsed and read in isolation, but must be read as a whole.  *See Harris v. Carter*, 582 A.2d 222, 229 (Del. Ch. 1990) ("the question is whether the accumulation of all factors creates the reasonable doubt to which *Aronson* refers"); *In re Cendant Corp. Derivative Litig.*, 189 F.R.D. 117, 128 (D.N.J. 1999) ("the trial court must not rely on any one factor but examine the totality of the circumstances and consider all of the relevant factors").

of reasonable doubt is akin to the concept that the stockholder has a 'reasonable belief' that the board lacks independence or that the transaction was not protected by the business judgment rule").

Plaintiff amply meets this burden by raising a reasonable doubt not only as to the ability of each of the thirteen Director Defendants to independently and disinterestedly evaluate the claims asserted in Plaintiff's Complaint, but also by alleging facts which demonstrate that the Director Defendants' approval of indefensible litigation tactics and/or conscious decision not to remedy the same were not the product of a valid exercise of business judgment. Accordingly, pre-suit demand was excused in this action.

## IV. THE COMPLAINT ADEQUATELY PLEADS THE FUTILITY OF DEMAND

### A. The Board's Actions are Not Shielded by the Business Judgment Rule

Plaintiff details facts in the Complaint which demonstrate that the Director Defendants acquiesced in or deliberately ignored Allstate's sustained and systematic defiance of court orders arising from its refusal to disclose the McKinsey reports. *See, e.g.* ¶¶ 23, 27, 37, 40, 42, 43, 47-54, 58. This conduct is not a valid exercise of business judgment and, therefore, such a decision is not protected under the business judgment rule.

As noted above, under the second prong of *Aronson*, demand is excused where the alleged facts raise a reasonable doubt that "the challenged transaction was otherwise the product of a valid exercise of business judgment." *Aronson*, 473 A.2d at 814. The business judgment rule presumes directors are acting in the best interests of the company, unless they abuse their discretion.[7] *Aronson*, 473 A.2d at 812. Illegal activities, whether a violation of statute or comparable expression of public policy, even if such a violation is undertaken in the corporation's best interests, can never constitute the exercise of valid business judgment. *See Desimone*, 924 A.2d at 934-35 ("it is utterly inconsistent with one's duty of fidelity to the corporation to consciously cause the corporation to act unlawfully); *In re Walt Disney Co. Derivative Litig.*, 906 A.2d 27, 67 (Del. 2006) ("A failure to act in good faith may be shown ... where [a] fiduciary acts with intent to violate applicable positive law.").

Here, Defendants adopted or approved a scheme to repeatedly and systematically violate and defy court orders and regulatory subpoenas despite the harm that would be inflicted on the

---

[7] The business judgment rule only applies to directors free of self-interest in the challenged transaction. *Grobow*, 539 A.2d at 187.

8

Company as a result. Indeed, by approving these practices, the Director Defendants have exposed themselves and the Company to potential criminal liability. *See* Florida Appeal Order at 17. These practices have also cost the Company considerable amounts in legal fees to defend this "strategy" before judicial and regulatory authorities. ¶¶ 40, 50. Most recently, the Director Defendants' misconduct has caused Allstate to lose its privilege to issue new insurance policies in Florida at a significant financial loss to the Company.

Nine of the thirteen current Board members were on the Board when the actions contesting Allstate's claims processing detailed in the Complaint began. ¶¶ 7-19. Despite the disastrous consequences of the Board's scheme, these Director Defendants have not taken any action to halt these damaging litigation practices or have, in fact, acquiesced in their continued application.

As recently stated by the Delaware Supreme Court in finding that plaintiffs had adequately alleged demand futility based on allegations of "bad faith":

> [T]he concept of ***intentional dereliction of duty, a conscious disregard for one's responsibilities***, is an appropriate (although not the only) standard for determining whether fiduciaries have acted in good faith. Deliberate indifference and inaction *in the face of a duty to act* is ... conduct that is clearly disloyal to the corporation. It is the epitome of faithless conduct.

*Walt Disney*, 906 A.2d at 62.

Plaintiff makes a nearly identical allegation - that the Director Defendants were aware of the risk of sanctions being imposed as a result of the Company's defiant litigation tactics – yet approved such practices or simply decided to do nothing to remedy them. In fact, Plaintiff here also alleges the Director Defendants actively, knowingly, and consciously made decisions to conceal the McKinsey reports and avoid any true inquiry into the issue by judicial and regulatory officials. ¶¶ 23, 25, 27, 39-40, 50-52. Stated simply, the Board chose to evade scrutiny, leading directly to the sanctions, both potential and actual, and losses complained of in the Complaint.

The Third Circuit was presented with remarkably similar facts in *Stanziale v. Nachtomi (In re Tower Air, Inc.)*, 416 F.3d 229 (3d Cir. 2005).[8] The *Tower Air* complaint alleged that the

---

[8] *Tower Air* was not a derivative action, but rather an action brought by a bankruptcy trustee. 416 F.3d at 232. *Tower Air* therefore does not directly address demand futility but nevertheless, contains an expansive analysis of the protections afforded directors by Delaware's business judgment rule. *Id.* at 238-42. This same analysis is applicable to the evaluation of whether Plaintiff has raised a "reason to doubt business judgment protection" of the Board's actions here. *Walt Disney*, 825 A.2d at 289

9

directors of an airline ignored warnings regarding inadequacies in aircraft maintenance and repair work. *Id.* at 239. The Third Circuit noted that ignoring such safety concerns was particularly egregious, since "[l]ives are on the line." *Id.* 239. Consequently the Third Circuit held that such conduct could never be the product of the board's valid exercise of business judgment, since "[t]he officers' alleged passivity in the face of negative maintenance reports seems so far beyond the bounds of reasonable business judgment that its only explanation is bad faith." *Id.* 239, *citing Parnes v. Bally Entm't Corp.*, 722 A.2d 1243, 1246 (Del. 1999). Similarly, in this action, the Board approved of, and failed to remedy, the Company's litigation tactics which have led to its present problems.

Here, the Director Defendants approved, or failed to remedy, a scheme to repeatedly violate court orders and regulatory subpoenas to conceal the Company's claims handling practices. The blatant disregard of valid court orders and subpoenas could never constitute the exercise business judgment. Thus, demand is excused as futile under the second prong of the *Aronson* test.

> 1. **Demand is Futile under the Theory Articulated by the Seventh Circuit in *Abbott Labs*.**

In *Abbott Labs,* the plaintiffs alleged that for six years, Abbott Labs' board of directors ***knew that the company had been accused of committing numerous violations of FDA rules and regulations***, but the board took no action to correct the problems or exercise reasonable oversight over the company's operations. *Abbott Labs.*, 325 F.3d at 802-803. The plaintiffs commenced a derivative action against Abbott's directors and alleged that pre-suit demand was excused because the board:

> knew of the continuing pattern of noncompliance with FDA regulations and knew that the continued failure to comply with FDA regulations would result in severe penalties and yet ignored repeated red flags raised by the FDA and in media reports ***and chose not to bring a prompt halt to the improper conduct causing the noncompliance, nor to reprimand those persons involved, nor to seek redress for Abbott for the serious damages it has sustained***. . . .

*Id.* at 803-804. The Seventh Circuit Court of Appeals reversed the district court's decision that the plaintiffs' allegations were insufficient to excuse demand, holding:

> [t]he facts support a reasonable assumption that there was a 'sustained and systematic failure of the board to exercise oversight', in this case intentional in that ***the directors knew of the violations of law, took no steps in an effort to prevent or remedy the situation, and that failure to take any action for such an***

10

> *inordinate amount of time resulted in substantial corporate losses, establishing a lack of good faith*. We find that six years of noncompliance, inspections, 483s, Warning Letters, and notice in the press, all of which resulted in the largest civil fine ever imposed by the FDA . . *indicate that the directors' decision to not act was not made in good faith and was contrary to the best interests of the company.*
>
> *With respect to demand futility based on the directors' conscious inaction, we find that the plaintiffs have sufficiently pleaded allegations, if true, of a breach of the duty of good faith* to reasonably conclude that the directors' actions fell outside the protections of the business judgment rule.

*Id.* at 810.

Indeed, just as in *Abbott Labs.*, Allstate has been subjected to fines for civil contempt in state judicial proceedings (¶50), judicial action by the State of Louisiana (¶40), regulatory action ultimately resulting in suspension by the FOIR (¶54), potential criminal liability (Florida Appeal Order at 17) as well as numerous public studies and negative reports in the media. Defendants cannot credibly argue that the directors fulfilled their fiduciary duties to oversee the Company, yet simultaneously, were totally ignorant of the ultimate negative impact that resulted from Allstate's attempts to foreclose widespread legal scrutiny of the Company's claims handling practices.[9]

---

[9] Defendants repeated reliance upon *McSparron v. Larson*, 2006 U.S. Dist. LEXIS 53773 (N.D. Ill. May 3, 2006) is misplaced. Unlike either this action or *Abbott Labs.*, the plaintiffs in *McSparron* were unable to plead the long term systemic violations and disregard for judicial or regulatory orders, but instead were only able to plead "two instances of ex-employees making salacious claims that were repeated in a class action complaint and investigated by the SEC." *Id*. at *15. On this basis, this Court in *McSparron* held that "[i]f this gave rise to the type of extreme indifference and failure to act that *Abbott* says creates enough of a likelihood of board member liability to justify a finding of demand futility, any board of any company with multiple operating units would constantly face liability." *Id.* *15-*16. Such concerns about the ease of pleading demand futility simply are not present here. The Board's approval of, or failure to remedy, the tactic of noncompliance with discovery obligations systematically put the Board on notice because of contempt orders imposing millions of dollars in fines and suspension from issuing new insurance policies in Florida – at a loss of **billions of dollars** in business. The defendants' reliance upon *In re IAC/InterActive Corp. Secs. Litig.*, 478 F. Supp. 2d 574 (S.D.N.Y. 2007), which action is currently on appeal before the Second Circuit Court of Appeals, is also misplaced. In *IAC*, the gravamen of derivative plaintiffs' demand futility allegations was that demand was futile because the directors lacked independence. Moreover, in *IAC* the federal court had already dismissed the class action complaint which contained the same allegations underlying the derivative case. *Id.* at 596. In contrast, this case does not involve the dismissal of related actions or focus solely on the Director Defendants' lack of independence. Quite the opposite is true. The Florida Court of Appeals upheld the suspension by the FOIR costing the Company billions of dollars in potential revenue because of the Board's scheme to withhold information from judicial and regulatory authorities. Further, Plaintiff here has pled the futility of pre-suit demand by alleging that the Director Defendants both lack independence and disinterestedness and that their conduct is not protected by the business judgment rule.

### B. Plaintiff has Created a Reason to Doubt the Disinterest and Independence of A Majority of the Board Under Either the *Aronson* or the *Rales* Test

Even if the Court does not find that pre-suit demand was futile because the Board failed to exercise valid business judgment, demand is still excused as futile under the *Rales* test. One means by which Plaintiff may raise such a reasonable doubt regarding the disinterestedness of the Board is by demonstrating that at least one-half of the members of the Board are subject to a substantial likelihood of liability. *Cendant*, 189 F.R.D. at 129 (demand futile where 16 of 23 directors faced a substantial likelihood of liability). Under Delaware law, "[d]irectors who are sued for failure to oversee subordinates have a disabling interest for pre-suit demand purposes when 'the potential for liability is not a 'mere threat' but instead may rise to a 'substantial likelihood.'" *In re Baxter Int'l, Inc. S'holders Litig.*, 654 A.2d 1268, 1269 (Del. Ch. 1995) (quoting *Rales*, 634 A.2d at 936). In such situations:

> Director liability for a breach of the duty to exercise appropriate attention may, in theory, arise in two distinct contexts. First, such liability may be said to follow ***from a board decision*** that results in a loss because that decision was ill advised or "negligent." Second, liability to the corporation for a loss may be said to arise from an ***unconsidered failure of the board to act*** in circumstances in which due attention would, arguably, have prevented the loss. (emphasis in original)

*Abbott Labs.*, 325 F.3d at 805 (quoting *Caremark*, 698 A.2d at 967). As explained by the Delaware Chancery Court in *Caremark*, a violation of duty exists if the directors "either lack good faith in the exercise of their monitoring responsibilities or permit a known violation of law by the corporation to occur." *Caremark*, 698 A.2d at 972.

#### 1. A Majority of the Directors are Interested Because they Face a Substantial Likelihood of Liability

Delaware courts have held that the substantial likelihood test is satisfied where a plaintiff alleges facts to support the inference that a majority of the directors on a board should have known that the corporation was engaging in imprudent or unlawful conduct and breached their fiduciary duty of good faith by failing to take corrective action. *See Ash v. McCall*, 2000 Del. Ch. LEXIS 144, *55-57 (Del. Ch. Mar. 15, 2000). Under this reasoning, "a sustained or systematic failure of the board to exercise oversight – such as an utter failure to attempt to assure a reasonable information and reporting system exits – will establish the lack of good faith that is a necessary condition to liability" sufficient to render demand futile. *Caremark*, 698 A.2d 959, 971 (Del. Ch. 1996); *see also In re Oxford Health Plans, Inc.*, 192 F.R.D. 111, 117 (S.D.N.Y. 2000).

Defendants, apparently with a straight face, claim that the Complaint "contains no particularized allegations regarding what the board knew about these cases, if anything, when they knew it, or what the board failed to do." Def. Mem. at 11. Defendants are wrong. The Complaint details the litigation, regulatory action and published studies that provided the Allstate Board with knowledge of the Company's litigation in connection with bad faith claims handling processes and the Florida regulatory proceedings. ¶¶37-40, 42-54. The Complaint further details the manner in which Allstate steadfastly disregarded valid orders of one court after another and flaunted its disobedience to regulatory subpoenas in a strategy to stonewall legal authorities in these actions, all in a wide-ranging and orchestrated fashion in an effort to conceal the McKinsey reports. ¶¶35-54. Contrary to defendants' characterization these were substantial legal issues which subjected Allstate to recurring fines for civil contempt, potential criminal liability and suspension of the Company's ability to operate in Florida's lucrative insurance market. Allstate has had to expend considerable funds to defend, appeal and settle with judicial authorities due to its failure to comply with its discovery obligations. *See, e.g.,* ¶¶50, 54. This Company-wide strategy, with its dire consequences, could not have been developed, deployed and paid for without either the Board's active or implicit approval.

Nevertheless, even if this Court declines to find that the Director Defendants had express knowledge of these practices, Plaintiff's particularized allegations are more than sufficient to render demand futile under the *Rales* test. Namely, Plaintiff's Complaint raises a reasonable doubt as to the Director Defendants' disinterestedness because an overwhelming majority of the Board faces a substantial likelihood of liability for its intentional ignorance of, or willful blindness to, "red flags" which should have alerted the Director Defendants to Allstate's reckless litigation strategy. The Director Defendants blindness to the "red flags" has subjected the Company to significant fines, potential criminal liability and loss of Allstate's ability to write new insurance in the state of Florida. Indeed, director liability may arise not only from considered inaction, such as discussed above, but also from an unconsidered failure of the board to act to prevent losses to the corporation. *Caremark*, 698 A.2d at 971 (where there is a "sustained or systematic failure of the board to exercise oversight" and where the directors have willfully ignored obvious signs of wrongdoing the lack of good faith upon which to condition liability is established).

If the Court finds that Plaintiff's allegations are "predicated upon ignorance of liability creating activities," *McCall v. Scott* is instructive. 239 F.3d 808; *Caremark*, 698 A.2d at 971-72. In *McCall*, the court held that the plaintiffs' claims did not involve a "conscious Board decision to refrain from acting" and therefore applied the *Rales* test to evaluate demand futility. *McCall*, 239 F.3d at 816. In this vein, the *McCall* court held that the plaintiffs had sufficiently alleged demand futility with respect to their claims for intentional or reckless breach of the duty of care because the board had ignored warning signs of potentially unlawful practices at the company. *McCall*, 239 F.3d at 819.[10]

In this case, Plaintiff has made strikingly similar allegations and has pointed to numerous "red flags" which should have alerted the Director Defendants to the dire consequences of the Company's flagrant disregard for court orders and defiance of regulatory bodies. Such red flags include, *inter alia*,: (i) the judicial and regulatory proceedings commenced in 2001, regarding Allstate's arbitrary bad faith claims processing practices in Kentucky, Missouri, New Mexico and Louisiana (¶¶36-38, 40, 42); (ii) the 2001 ruling in *Geneva Hager v. Allstate Ins. Co.*, 98-cl-2482, Fayette Circuit Court Kentucky, that the McKinsey reports were not trade secrets (¶38); (iii) the FOIR investigation commenced in October 16, 2007 for which the Company was subpoenaed for information and asked to produced witnesses (¶43); (iv) the suspension of Allstate's certificate of authority to write new insurance in Florida for non-compliance with a subpoena issued in the FOIR investigation (Florida Appeal Order); and (v) the fine, amounting to $25,000 per day beginning September 12, 2007, levied against the Company by a Missouri court in an action styled *Dale Deer v. Allstate Ins.,* Case No. 0516-CV24031, for Allstate's ongoing failure to comply with its discovery obligations, including production of the McKinsey reports (¶40). In light of these "red flags," it is clear that the Director Defendants' failure to act was reckless and willful, subjecting them to a substantial likelihood of liability for the "unconsidered inaction." Accordingly, demand is excused.

---

[10] The *McCall* court inferred that the defendants' failure to act was reckless and willful in light of *qui tam* actions which had been brought against the company, extensive investigations into the company's unlawful practices, a *New York Times* investigation and that the company had previously been "investigated for and settled allegations of questionable billing, cost reporting, and marketing practices" for $475,000 plus $1.1 million in reimbursement for unsupportable or questionable expenditures. *Id.* at 819-21.

### 2. Plaintiffs' Remaining Allegations Also Demonstrate Demand Futility

In addition to demonstrating that demand is futile because the Director Defendants are interested or because their conduct is not shielded by business judgment rule, demand is also excused because Plaintiff has pleaded that certain Director Defendants lack independence.

Defendants Liddy and Wilson could have not have fairly considered a demand on its merits, because one "extraneous consideration or influence" that destroys director independence is the financial reward that accrues to him by virtue of his position as an executive of the Company.[11] Hence, the fact that a director receives substantial financial compensation from his employment is sufficient to raise a reasonable doubt regarding the director's independence from others who have the ability to control his employment and compensation. *See Rales*, 634 A.2d at 937 ("there is a reasonable doubt that [a director] can be expected to act independently considering his substantial financial stake in maintaining his current offices"); *In re The Student Loan Corp. Derivative Litig.*, No. 17799, 202 WL 75479, *3 (Del. Ch. Jan. 8, 2002) (allegations that a director owes their livelihood to their employer, without elaboration on the exact compensation, sufficient to show lack of independence).

These allegations, when coupled with each Director Defendants' substantial likelihood of liability, bolster Plaintiff's demand futility allegations.[12]

### V. CONCLUSION

For all the foregoing reasons, Plaintiff respectfully requests that the Court deny defendants' Motion to Dismiss in its entirety, and grant such other relief as appropriate.[13]

---

[11] At the time this action was commenced, defendant Wilson's principal professional occupation was as CEO and President of Allstate. ¶¶19, 58(b). Similarly, Liddy was President and CEO for much of the relevant period. ¶¶13, 58(b). In fact, for fiscal year 2006, Allstate paid Liddy $24 million and Wilson $8 million in salary, stock awards and other compensation. Accordingly, Plaintiff has pled reasonable doubt regarding the independence of defendants Wilson and Liddy, rendering them incapable of impartially considering a demand to commence and vigorously prosecute this action.

[12] *See Harris*, 582 A.2d at 229 (noting that no single factor is dispositive because "the question is whether the accumulation of all factors creates the reasonable doubt to which *Aronson* refers.").

[13] Plaintiff respectfully requests leave to amend if the Court is inclined to grant defendants' motion to dismiss. A district court should freely grant leave to amend. *Vance v. Gallagher*, No. 02 C 8249, 2004 WL 1510016 (N. D. Ill. Jul. 7, 2004). If granted such leave, Plaintiff would include allegations concerning, *inter alia*, the confirmation by Florida Governor Charlie Crist that in an April 24, 2008 article in *tampabay.com* that Allstate quietly offered Florida $10 million to let the Company "off the hook" and retract the order that would prevent Allstate from selling new policies in Florida. The details provided in the Florida Appeal Order will also be included in the amended complaint.

Dated: May 15, 2008                                          **KRISLOV & ASSOCIATES, LTD.**


By:    s/ Jeffrey M. Salas
Clinton A. Krislov
Jeffrey M. Salas
20 North Wacker Drive
Chicago, Illinois  60606
Tel: 312-606-0500
Fax: 312-606-0207

**FARUQI & FARUQI, LLP**
Nadeem Faruqi
Jamie R. Mogil
369 Lexington Avenue, 10th Floor
New York, New York 10017
Tel: 212-983-9330
Fax: 212-983-9931

-and-

Emily C. Komlossy
Fla. Bar No. 007714
3595 Sheridan Street, Suite #206
Hollywood, Illinois 33020
Tel: 954-239-0280
Fax: 954-239-0281

*Attorneys for Plaintiff*

16